MASSACHUSETTS FARM BUREAU FEDERATION, INC. *vs.*
BLUE CROSS OF MASSACHUSETTS, INC., & another.[1]

Middlesex.   September 16, 1988. — January 9, 1989.

Present: HENNESSEY, C.J., ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Consumer Protection Act*, Availability of remedy, Unfair act or practice, Insurance.

In a civil action in which the plaintiff alleged that the defendant engaged in unfair and deceptive acts in violation of G. L. c. 93A, §§ 2 & 11, the judge was not warranted in entering judgment for the plaintiff where there was no evidence of a causal relationship between the alleged unfair acts and the claimed loss and where the acts were found to be otherwise free from fraud and deceit. [730-731]

CIVIL ACTION commenced in the Superior Court Department on August 28, 1981.

The case was heard by *Robert J. Hallisey*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Edward J. Dailey* (*Susan M. Gretkowski* with him) for the defendants.

*William E. Ryckman, Jr.* (*Charles A. Goglia, Jr.*, with him) for the plaintiff.

O'CONNOR, J. Massachusetts Farm Bureau Federation, Inc. (Farm Bureau), is a Massachusetts nonprofit corporation with a membership comprised of Massachusetts farmers. Farm Bureau provides various services to its members including the provision of health care insurance coverage. That coverage was provided from July 1, 1972, through June 30, 1982, by the defendant corporations Blue Cross of Massachusetts, Inc., and Blue Shield of Massachusetts, Inc. (Blue Cross-Blue Shield). Farm Bureau terminated its relationship with Blue

---

[1] Blue Shield of Massachusetts, Inc.

Cross-Blue Shield at the close of the policy year ending June 30, 1982. At that time, $448,557 was credited to Farm Bureau as a rate stabilization fund maintained by Blue Cross-Blue Shield. When Farm Bureau did not renew the coverage for the year beginning July 1, 1982, Blue Cross-Blue Shield transferred the $448,557 to its own members' reserve.

After a jury-waived trial, a judge of the Superior Court concluded that Blue Cross-Blue Shield's "attempts to work a forfeiture" of the $448,557 constituted unfair or deceptive conduct proscribed by G. L. c. 93A (1986 ed.). He also concluded that the unfair or deceptive conduct was "deliberate, willful, and knowing" and, accordingly, he awarded damages in the sum of $897,114 (2 x $448,557), interest, and attorneys' fees for a total of $1,587,303.97. Blue Cross-Blue Shield appealed, and we transferred the case to this court on our own initiative. We reverse the judgment and remand for the entry of a judgment for Blue Cross-Blue Shield.

Farm Bureau's amended complaint is in five counts. Counts 1 and 4 allege violations of G. L. c. 93A. The other counts assert breach of contract and deceit. We focus on counts 1 and 4 because the judge found for Blue Cross-Blue Shield on the other counts, and Farm Bureau has not appealed. Count 1 alleges in material part as follows: There was no written contract between the parties; the only written description of their relationship is contained in their correspondence. Since 1972, Blue Cross-Blue Shield consistently represented to Farm Bureau that its rates were based solely on Farm Bureau's own experience, using such terms as "self-rated" and "the group will make its own rate." By using such terminology, Blue Cross-Blue Shield "effectively represented . . . that its premiums were closely related to losses and expenses." In addition, Blue Cross-Blue Shield failed to provide Farm Bureau with timely and accurate information about claims paid, administrative expenses, and surplus generated.

Count 1 alleges that from July 1, 1976, through June 30, 1979, Farm Bureau paid $716,117 in premiums in excess of the losses and expenses incurred by Blue Cross-Blue Shield for those years; that Farm Bureau was not told about that

"surplus" until July, 1979; and that "[t]he failure of Blue Cross-Blue Shield to disclose the true nature of its rate making process and to disclose in a timely fashion the true data concerning the Farm Bureau's claims experience, combined with its misleading insistence that the Farm Bureau was rated solely by its own experience, constitute unfair and deceptive practices within the meaning of Chapter 93A and Chapter 176D of the general laws." Claiming that the "cumulative surplus" on July 1, 1980, was $728,695, Farm Bureau in count 1 seeks judgment in that amount tripled, together with attorneys' fees and interest.

We turn to the allegations in count 4 of the amended complaint: Sometime in 1976, an agent of Blue Cross-Blue Shield wrote to Farm Bureau that, on July 1, 1976, Blue Cross-Blue Shield "will begin to credit your account with claims reserves which in future periods may be used as a rate stabilization fund." Count 4 alleges that that letter "was deceptive in that it tended to lead the Farm Bureau and its members to believe they would receive some kind of direct credit for excesses of premiums over losses and expenses. The Farm Bureau and its members relied upon this statement by renewing their contract for the years 1976, 1977, 1978, 1979, and 1980."

Count 4 further alleges that, in July, 1979, Blue Cross-Blue Shield filed with the Commissioner of Insurance a rate stabilization fund plan which was unfair and deceptive because (1) it gave no credit to the plaintiff for "surplus" generated from 1976 to 1979, contrary to its earlier letter to Farm Bureau, and (2) the plan "imposed a reserve minimum of 25% of one year's premiums; only the excess over 25% would apply towards next year's premiums as a credit." According to count 4, after an informal meeting involving the insurance commissioner's office in January, 1980, Blue Cross-Blue Shield "acknowledged its 1976 commitment to credit reserves beginning in 1976. However, Blue Cross-Blue Shield otherwise left the rate stabilization fund plan in effect as filed." The rate stabilization fund yielded no credits to the plaintiff for the year beginning July 1, 1979, "because the [$716,117] surplus was below 25% of the premiums for 1979." Farm Bureau received no credit for the following year either.

403 Mass. 722                                                                 725

Massachusetts Farm Bureau Federation, Inc. *v.* Blue Cross of Massachusetts, Inc.

We continue the description of the allegations in count 4. On November 20, 1980, Blue Cross-Blue Shield sent Farm Bureau a letter outlining a "new methodology" for the rate stabilization fund. Blue Cross-Blue Shield calculated that for the policy year ending June 30, 1980, the reserve had increased from $716,117 to $728,695, and Blue Cross-Blue Shield promised that 50% of that amount ($364,368) "would be applied to prospective premiums for the policy year beginning July 1, 1981." On March 3, 1981, Blue Cross-Blue Shield wrote Farm Bureau that the figures contained in the November 20, 1980, letter were incorrect and that, correctly calculated, the reserve for the year ending June 30, 1980, was not $728,695, but instead was $655,634. Farm Bureau protested unsuccessfully to the Commissioner of Insurance. Farm Bureau alleges in substance that Blue Cross-Blue Shield unilaterally imposed the recomputed figures on Farm Bureau and its members for the policy year beginning July 1, 1981; that Farm Bureau was not free to reject those computations or to switch its coverage to another insurer "because Blue Cross-Blue Shield has taken the position that no part of the accumulated reserve would be refunded if the Farm Bureau and its members dropped their coverage." Count 4 concludes with an assertion that the "entire course of dealing outlined above constitutes a series of unfair and deceptive practices under chapter 176D and chapter 93A," followed by a request for judgment in the sum of $728,695, tripled, plus attorneys' fees, interest, and costs.

The judge made detailed findings which we summarize. Each year from 1972 through 1975, Blue Cross-Blue Shield solicited the renewal of Farm Bureau's group health insurance business with letters indicating that Farm Bureau's premiums would be based on the group's experience. In the spring of 1976, Blue Cross-Blue Shield wrote: "For the rating period effective on your July 1, 1976 anniversary date Blue Cross-Blue Shield will begin to credit your account with claims reserves which in future periods may be used as a Rate Stabilization Fund . . . ." In the spring of 1978, Blue Cross-Blue Shield again wrote to Farm Bureau that premium prices were reached "using your past experience."

During the period 1975 to 1979, Farm Bureau expressed its increasing concern about rising premium costs. Blue Cross-Blue Shield wrote a letter stating that Farm Bureau's rates were among the lowest of association groups and again indicating that rates for the year beginning July 1, 1979, would be based on "your experience."

In June, 1979, the judge found, Blue Cross-Blue Shield filed with the Commissioner of Insurance a plan for a "Rate Stabilization Fund." The plan provided that each year's excess premiums would be carried forward until the accumulated reserve exceeded twenty-five percent of the annual premium, at which point the amount over twenty-five percent would be used to offset prospective premiums. The plan provided that "[i]n case of cancellation any unused rate stabilization fund will be transferred to the Blue Cross-Blue Shield members reserve." Farm Bureau met with Blue Cross-Blue Shield on June 27, 1979, and renewed its coverage for the year beginning July 1, 1979. On July 3, 1979, Blue Cross-Blue Shield sent Farm Bureau a letter confirming the existence of the rate stabilization plan for the year beginning July 1, 1979. As it worked out, because of the twenty-five percent floor, the plan did not benefit Farm Bureau in the policy years beginning July 1, 1979, or July 1, 1980.

In February, 1980, Blue Cross-Blue Shield informed Farm Bureau that its premium payments from July 1, 1976, through June 30, 1979, had resulted in a "members reserve" surplus of $716,117. This was the first time that Blue Cross-Blue Shield had confirmed to Farm Bureau the existence of such a substantial surplus. In April, 1980, Blue Cross-Blue Shield wrote a letter reiterating that Farm Bureau's rates were "totally dependent on its own experience" and noting that Farm Bureau's "members reserve" had almost reached the twenty-five percent threshold. In June, 1980, Farm Bureau's lawyers wrote to the Commissioner of Insurance requesting an investigation of unfair and deceptive practices under G. L. c. 176D, § 6. The commissioner declined to take any action.

The judge found that before December 1, 1980, Blue Cross-Blue Shield changed the method of computing the rate stabili-

zation fund for associations and chambers of commerce. The new plan, which was filed with the Commissioner of Insurance, would allow fifty percent of the accumulated surplus to be applied to the prospective premiums each year. This straight fifty percent credit was "marked liberalization" of Blue Cross-Blue Shield's policy with respect to Farm Bureau's rate stabilization fund. The final sentence of the memorandum by which the new plan was promulgated read: "The rate stabilization fund, negative or positive, carries forward ad infinitive with the fund, negative or positive, on termination of the account becoming an asset or liability of the corporations."

By a letter dated November 20, 1980, Blue Cross-Blue Shield advised Farm Bureau that the new rate stabilization plan would apply to Farm Bureau as of July 1, 1981, and that $364,348 (½ x $728,695) would be applied to the premium for the policy year beginning on that date. Because of subsequent recomputations, the figure was reduced first to $327,817 (½ x $655,634) and then to $303,246.

Farm Bureau did not renew its coverage after the expiration of the policy year ending June 30, 1982. At that time, the rate stabilization fund amounted to $448,557. Blue Cross-Blue Shield transferred that money to its own members' reserve.

In treating the contract claims and the claim sounding in common law tort for deceit, the judge concluded that Blue Cross-Blue Shield's statements to Farm Bureau that its premiums would be "self-rated," based "on its own experience" and the like were not sufficiently definite to be enforceable or actionable. The judge observed that "[w]hile the phrases connote that the premiums will be established by some reference to prior losses, many other factors affect rates: defendant's expenses, reserves for late claims and length of time to be carried, minimum and maximum limits, state tax multipliers, defendant's profit if any, and, effect of cancellation." (Footnote omitted.) The judge also noted that the term "rate stabilization plan" "does not have a single fixed meaning, but is susceptible to negotiation in many variations." The judge was "not persuaded . . . that defendant *intended* not to make plaintiff's rates retrospective based on experience" (emphasis added) and

therefore found no knowing falsehood on which to base a theory of fraud, deceit, or misrepresentation.

Having concluded that Farm Bureau was not entitled to recover for breach of contract or in tort for fraud, misrepresentation, or deceit,[2] the judge then focused on G. L. c. 93A as providing Farm Bureau with a right of recovery. The judge reasoned that, while terms such as "self-rating" are imprecise, they nevertheless "connote that premiums will be adjusted so that defendant will make only a reasonable profit on the business, not that substantial surpluses will accumulate and be carried forward." Here, the judge found, the surplus had grown to $716,177 by May, 1979, and there was no evidence that Farm Bureau was aware of that.

Turning, then, to the two rate stabilization plans, the judge noted that, in the first plan, Blue Cross-Blue Shield stated plainly that "in case of cancellation any unused rate stabilization fund will be transferred to the Blue Cross-Blue Shield members reserve." He contrasted with that "clear and easily understood language," the final sentence of the second rate stabilization plan: "the Rate Stabilization Fund, negative or positive, carries forward ad infinitive with the fund, negative or positive, on termination of the account becoming an asset or liability of the corporations." The judge characterized that sentence as "totally unintelligible," noting that "Farm Bureau is a corporation as are other associations and chambers of commerce, and the plan does not define 'the corporations' to which it appears the fund should go 'on termination' of 'the account.'" The judge concluded that, by the time Farm Bureau ended its association with Blue Cross-Blue Shield, Farm Bureau "had a right to believe it had a vested interest in 50% of the surplus and [rate stabilization plan] credits. Had defendant meant the same as the sentence of the first [rate stabilization plan], it could have said so."

---

[2] Because Farm Bureau has not appealed from the judgment in favor of Blue Cross-Blue Shield on the breach of contract count and common law tort for deceit, there is no occasion for us to consider those rulings. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 43 n.5 (1977). See also Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

403 Mass. 722                                                   729

Massachusetts Farm Bureau Federation, Inc. *v.* Blue Cross of Massachusetts, Inc.

The judge "infer[red] the switch from [the] clear language of [the first rate stabilization plan] to the gibberish of [the second plan] was deliberate, willful, and knowing." He concluded: "The dealings between plaintiff and defendant were clearly business to business . . . . While I cannot quite find that defendant's failure to disclose to plaintiff the amassing of substantial surpluses in the years July 1976 to June 1979 was an unfair or deceptive act, I conclude, against that background, that defendant's attempts to work a forfeiture, upon plaintiff's failing to renew in June, 1982, of $448,557 based on the unintelligible last sentence of [the second rate stabilization plan] was. I therefore award plaintiff double the $448,557, or $897,114 plus interest and attorney's fees."

General Laws c. 93A, §§ 2 and 11 (1986 ed.), make unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce" between two businesses.[3] An act or practice may be "unfair" within the statutory meaning without being deceptive or fraudulent. *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 578 (1986). Furthermore, a violation of G. L. c. 93A, § 11, need not be premised on a violation of an independent common law or statutory duty. *Linthicum* v. *Archambault*, 379 Mass. 381, 383 (1979). *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1979). Conduct may violate § 11 if it is "within 'at least the penumbra of some common-law, statutory, or other established concept of unfairness . . . [or] is immoral, unethical, oppressive, or unscrupulous.'" *Zayre Corp.* v. *Computer Syss. of Am., Inc.*, 24 Mass. App. Ct. 559, 570 (1987), quoting *Levings* v. *Forbes & Wallace, Inc.*,

---

[3] Blue Cross-Blue Shield cites in its brief language from *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979), to the effect that in cases of dealings between businesses, liability under c. 93A requires "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Blue Cross-Blue Shield asserts that since Farm Bureau is a business, "with a background of knowledge, resources, and experience in the insurance industry," there is no reason to expect Blue Cross-Blue Shield "to modify [its] standard practices for dealing with major business accounts." In short, Blue Cross-Blue Shield's "standard practices" do not descend to the level of "rascality" necessary for liability.

8 Mass. App. Ct. 498, 503-504 (1979), *S.C.,* 12 Mass. App. Ct. 990 (1981). See *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 777 (1980).

The judge's findings establish that the defendants' acts and practices were free from fraud and deceit. He concluded, nevertheless, that "against [the] background" of "the amassing of substantial surpluses in the years July, 1976 to June 1979" the "defendant's attempts to work a forfeiture, upon plaintiff's failing to renew in June 1982, of $448,557 based on the unintelligible last sentence of [the second rate stabilization plan] was [unfair]."

We need not decide whether the judge was warranted in concluding that the last sentence of the second rate stabilization plan, stating that "the Rate Stabilization Fund, negative or positive, carries forward ad infinitive with the fund, negative or positive, on termination of the account becoming an asset or liability of the corporations," was unintelligible gibberish as the judge characterized it, or whether he was warranted in finding that between 1976 and 1979 the defendants "amass[ed] . . . substantial surpluses."[4] Even if we assume that the judge's finding relative to the last sentence of the second plan, a finding critical to his decision, was warranted, Farm Bureau is nevertheless not entitled to recover because there was no evidence that would warrant a further finding that there was a causal relationship between the "unintelligible" statement and any loss claimed by Farm Bureau. In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery. See *International Fidelity Ins. Co.* v. *Wilson,* 387 Mass. 841, 850 (1983); *Kohl* v. *Silver*

---

[4] Presumably, the fund would be positive or negative depending on whether paid-in premiums exceeded or did not exceed claims losses, administrative expenses, and other charges. It is at least arguable that the sentence in question means that the fund balance whether positive or negative, continues "ad infinitum," that is, without end or limit, and "on termination of the account [it becomes] an asset or liability of the corporations [Blue Cross of Massachusetts, Inc., and Blue Shield of Massachusetts, Inc.]."

The amount of $728,695, accumulated over several years, was less than twenty-five percent of one year's premiums.

*Lake Motors, Inc.*, 369 Mass. 795, 800 (1976). Farm Bureau makes no claim in its amended complaint that it misunderstood the terms of the second rate plan or that it expected that, upon termination of coverage, it would be entitled to any positive balance in the rate stabilization fund, and there was no evidence of any lack of understanding in that regard.

To the contrary, James Slattery, Farm Bureau's administrator, testified that he understood that the first rate stabilization plan was to be replaced by another plan and that, under the second plan, "fifty percent would be applied against the rates." On inquiry by the judge as to how he understood the last sentence of the second plan, Slattery testified: "We understood at that point that it was Blue Cross's position that they were going to keep whatever funds had accumulated over the years in that rate stabilization fund if we terminated." The court asked, "Did you so understand that sentence?" and Slattery answered, "yes."

We conclude that Farm Bureau is not entitled to recover on the single theory relied on by the judge, and, in view of the judge's findings, we perceive no other basis for recovery. Therefore, we reverse the judgment and remand for the entry of judgment for the defendants.

*So ordered.*